**GARTER–BARE COMPANY, an unincorporated association (a limited partnership), and Knut L. Bjorn-Larsen, Plaintiffs and Appellants,**

v.

**MUNSINGWEAR INC., a corporation, et al., Defendants-Appellees.**

Nos. 82–5270, 82–5439.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 26, 1983.

Decided Jan. 13, 1984.

708

John E. Wagner, Glendale, Cal., Lillian Tomich, Robert W. Driscoll, Driscoll & Tomich, San Marino, Cal., for plaintiffs and appellants.

Lawrence C. Brown, Faegre & Benson, Minneapolis, Minn., Leonard Janofsky, Paul, Hastings, Janofsky & Walker, Los Angeles, Cal., Douglas J. Williams, Merchant, Gould, Smith, Edell, Welter & Schmidt, Dwight H. Oglesby, Minneapolis, Minn., for defendants-appellees.

Before CHAMBERS, ELY and WALLACE, Circuit Judges.

CHAMBERS, Circuit Judge:

This action was filed by Garter-Bare, a limited partnership, and by Larsen, its general partner, in California Superior Court on January 20, 1972, and was then removed to the United States District Court where summary judgment was rendered in favor of the defendant, Munsingwear. In *Garter-Bare v. Munsingwear*, 650 F.2d 975 (9th Cir.1980), (hereafter *"Garter-Bare I"*) we reversed the summary judgment on the ground that there were triable issues of fact that precluded its use. On remand, the jury rendered its verdict for the plaintiffs granting them $3,000 for breach of contract, royalties (in an amount to be determined) of 7% for patent infringement, $500,000 for trade secret misappropriation, and $15 million compensatory damages and an additional $15 million as punitive damages, for fraud.

Munsingwear moved for judgment notwithstanding the verdict or for new trial and thereafter made a second motion for new trial, now alleging the discovery of new evidence. The district judge granted judgment n.o.v. as to all but the fraud claim, or a new trial if the judgment n.o.v. were overturned. He granted a new trial on the fraud claim, but thereafter granted summary judgment in favor of Munsingwear on the ground that the claim was barred by the California statute of limitations (C.C.P. § 338(4)). An interlocutory appeal from the final judgment (No. 82–5270) merged with an appeal from the final judgment (No. 82–5439), after the order for summary judgment on the fraud issue had been entered. The complaint is stated in several claims. We will discuss them separately and, as we do so, the interrelationship of the claims will become self-evident.

*Contract Claims:*

Judgment n.o.v. was granted as to the claims founded on the written contract executed by the parties, on the basis that they were barred by the four-year statute of limitations under California law (C.C.P. § 337(1)). The standard for reviewing judgments n.o.v. is the same with this Court as it is with district courts and it applies not only to the contract claims, but to other claims raised by the complaint (see *infra*).

Judgment n.o.v. is proper if the evidence permits of only one reasonable conclusion as to the verdict. *California Computer Products v. International Business Machines Corp.,* 613 F.2d 727, 733 (9th Cir.1979); *Fountila v. Carter,* 571 F.2d 487 (9th Cir.1978). On appeal from judgment n.o.v., we view the evidence in a light most favorable to the party against whom the motion is made. *Shakey's Inc. v. Covalt,* 704 F.2d 426, 430 (9th Cir.1983); *Kaplan v. Burroughs Corp.,* 611 F.2d 286, 290 (9th Cir.1979). The key issue is that of the existence of substantial evidence to support the jury's verdict.

In their Agreement of July 9, 1965, the parties agreed to a three-phase program for the commercial application of the Larsen process for a garterless device for support-

ing women's hosiery: a six-month research and development phase, followed by a two-year phase during which Munsingwear would have an exclusive license, followed by a third phase during which the parties would share proceeds from industry-wide licensing.

Executed contemporaneously with the Agreement, which by its terms said nothing about cancellation, was a First Amendment to the Agreement, providing such right to both parties. The provision giving Munsingwear this right stated that it might cancel:

> . . . upon 90 days prior written notice to the licensor Garter-Bare; however, any and all royalties due and accruing to Garter-Bare at the cancellation date shall be paid within 30 days of cancellation."

A Second Amendment extended the original six-month research and development phase for six months and provided for monthly payments of $1000 per month, "or said Agreement is terminated as provided for therein." The collaboration of the parties continued at times without any formal extension of the research and development period. But a Third Amendment was executed extending it for a six-month period, to expire on January 1, 1968, and its wording was substantially the same as the Second Amendment.

In *Garter-Bare I,* we held that disputed fact issues relating to the contract claims precluded pretrial summary judgment based on the statute of limitations (C.C.P. § 337(1)). At the trial, on remand, the jury determined that a letter from Munsingwear on December 22, 1967, was accepted by Garter-Bare "as a termination of the agreement to pay the $1000 per month", but that Garter-Bare "retained its claims to the three monthly payments which it contends was [sic] due it." The jury also specifically found that the parties did not mutually intend the research and development phase to be extended beyond January 1, 1968.

Given these findings as the intent of the parties we conclude, with the district judge, that the four-year statute of limitations began to run at least by December 22,

1967, or surely by January 1, 1968 when the first of the three disputed $1000 payments was not paid. In any event, by January 18, 1968, when Munsingwear notified Garter-Bare that it intended to make no further payments.

In *Garter-Bare I,* 650 F.2d at 979, we unwisely did what we had chastised the district judge for doing, i.e. anticipating the jury on questions of fact. Our statement that C.C.P. § 337(1) could not begin to run until the first payment was due and was not paid (which we stated would be thirty days after December 22), was not accurate and we retract it. The terms of the Agreement called for payment at the first of the month; this is what the parties agreed to. Therefore, the failure or refusal of Munsingwear to make the payment due on January 1, 1968, was of unquestionable significance in the factual history of the case. As the complaint was not filed until January 20, 1972, judgment n.o.v. was the appropriate action for the district court to take on the issue of the claims based on written contract.

*Patent Claims:*

The amended complaint claims infringement of the Larsen patent, namely his '748 patent for a process of making an effective single-layer garterless panty-girdle leg. At the time that the parties executed their Agreement, in 1965, Larsen warranted that the device that he was disclosing to Munsingwear either was, or would be, covered by patents. The process referred to at that time was for a double-layer cuff on the girdle leg. The jury accepted his contention that the parties "by their conduct mutually intended that the research and development program be extended to include the single-layer garment." There is substantial evidence to support their finding on this issue. The jury also held that Larsen's single-layer patent, thereafter obtained as '748, was valid and that it had been infringed by Munsingwear.

The district judge granted judgment n.o.v. on the ground of the obviousness of the '748 patent, accepting the jury

verdict as advisory only, and as was his right exercising the duty to determine the issue of obviousness as a matter of law. Appellants appropriately concede that obviousness is a question of law for the court. *Sarkisian v. Winn-Proof Corp.,* 688 F.2d 647, 651 (9th Cir.1982), cert. denied sub nom. *Carsonite International Corp. v. Carson Mfg. Co.,* —— U.S. ——, 103 S.Ct. 1499, 75 L.Ed.2d 930 (1983). However, they contend that the district judge did not review the Larsen patent claims against the standard set by *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966), i.e., by considering 1) the scope and content of the prior art, and 2) the differences between the prior art and the claims at issue, and 3) the level of ordinary skill in the art. We must reject their argument on this score. The district judge held that the claimed patentable aspects of the '748 device were not novel and that Larsen had not produced anything beyond the ordinary skill in the art, but rather that his claimed novelty was reflected in two patents that had not been before the patent examiner. We cannot say on this record that the district judge's conclusions were clearly erroneous. F.R.Civ.P. 52(a); *Sarkisian v. Winn-Proof Corp., supra,* at 651. The judgment n.o.v. on this issue is affirmed; the jury's award of royalties based on the claimed infringement of the '748 patent is reversed.

*Fraud Claims:*

The jury awarded Garter-Bare $15 million as compensatory damages for Munsingwear's fraud and also awarded Garter-Bare a further $15 million as punitive damages. The district judge granted a new trial on the ground that the patent was not valid and the jury's consideration of the fraud issues was contaminated by its reliance on the supposed validity of the '748 patent.

The jury had also specifically found that the complaint, filed on January 22, 1972, was timely-filed insofar as the statute of limitations for fraud (C.C.P. § 338(4)) was concerned.

That statute provides for a three year period for fraud, or mistake but:

The cause of action in such case [is] not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake.

In *Garter-Bare I,* 650 F.2d at 981, we stated the test that is applied in California as "when a reasonably prudent person would have had such knowledge as to put him on inquiry." *Hobart v. Hobart Estate Co.,* 26 Cal.2d 412, 437, 159 P.2d 958 (1945). We also there held that pretrial summary judgment was improper as to the issue of the statute of limitations for fraud, as disputed questions of fact, or facts susceptible of opposing inferences, are tried by the jury and disputed questions of fact existed in the case.

At the trial, the jury specifically found that the complaint, filed on January 22, 1972, was timely insofar as the fraud claims were concerned. The jury responded "No", to a special interrogatory asking:

Do you find that Larsen had such information as would lead a reasonable man to suspect that Munsingwear was defrauding him *more than three* years before the commencement of this legal action?

On the motion for new trial, the district judge held that this finding was "contrary to the great weight of the evidence" and granted the new trial. Later, following the receipt of "new evidence" offered in support of Munsingwear's motion for new trial, he granted Munsingwear's post-trial motion for summary judgment on the basis that the matter was barred by the applicable statute of limitations.

Garter-Bare argues that the evidence is not "new", and perhaps more important, it argues that it is not material and is not of a quality to permit the district judge to overturn the jury's finding on the issue of the statute of limitations. The materiality contention is one that demands close review.

Evidence that was in the record before us in *Garter-Bare I* is summarized in that opinion. At the trial the jury was aware of that evidence, including evidence of Larsen's communications with his attorney Mr. Burum, in the final weeks of December

1967 and during January 1968, after Munsingwear, by its letter of December 22, 1967, announced that it "did not wish to renew" the Agreement beyond the final date (January 1, 1968) of the last extension of the research and development period.

The jury also had before it testimony from Mr. Larsen that during 1968, he had consulted Mr. Burum and also his patent attorney, Mr. Wallen. He also testified that he had consulted with Mr. Graham Sterling whom he described in his testimony as being not only an attorney, but a member of the Board of Trustees of Occidental College, where Larsen had several friends on the faculty or in the administration. He also testified that he had consulted two other patent attorneys. One of them, Robert Parker, was also a friend whom he knew through Occidental College.

The jury was also aware that around December 22, 1978, Larsen obtained knowledge of an advertisement in Women's Wear Daily announcing Munsingwear's intended release for merchandising of new styles in its Vassarette line of girdles. Several ads are in the record, many of them showing a woman dressed in street clothing; the written portions of the ads stress that the new garterless styles eliminated bulges caused by garters and permit a smoother contour in the woman's outer clothing. One ad shows a woman dressed in a girdle, but there is no way of determining from a study of the ad whether it is, for instance, a double-layer leg (which had been merchandised in various forms before) or a single-layer leg. Moreover, there was nothing in the picture that would disclose the type of friction element. The ads speak of a "stocking locking" girdle with "soft stretch knit" and speak of the legs of the girdle locking the stocking leg in place. One speaks of "ripples of foam" but, again, this is totally inadequate to give notice of the technical nature of the friction element.

Larsen testified that he could not determine if the advertised styles encompassed his ideas. His attorney advised him that it would be necessary to obtain a garment, and study it, in order to determine if there were any patent infringement. A specimen girdle was obtained on January 22, 1969, within the three-year period predating the filing of the complaint.

Larsen's examination of the girdle led him to conclude that his ideas had been used, but he also noticed a label indicating that the garment was protected by a patent or patent pending. His inquiry to Munsingwear, asking for clarification, produced a letter dated January 22, 1969, from Munsingwear's attorney stating that he had "no knowledge of any Patents or Patent Applications containing allowed claims that would cover style No's. 888 and 988." Larsen's single layer patent application was then before the Patent Office and Larsen stated that he considered that he was being invited to follow through on that application and thus "make good" on the warranty language in his Agreement with Munsingwear, stating that patent protection would be available on the inventions covered by that Agreement.

In the spring of 1970 Larsen learned for the first time that Connie Cuozzi, hired by Munsingwear in May 1967, had applied for a patent applicable to styles 888 and 988 in February 1969 (thus within weeks of the date of the letter advising of no knowledge of any patent applications). Garter-Bare's attorney argued to the jury that there was no notice of any fraudulent activity (as opposed to conduct related to breach of contract or patent infringement) prior to the time Larsen obtained knowledge of the Cuozzi patent or, at the very earliest, when the specimen garment was obtained for inspection. We must assume, on this record, that the jury agreed and that its agreement is reflected in its finding that the fraud issues were not barred by the reasonable person standard of the statute of limitations.

The materiality of the "new evidence" offered on Munsingwear's motion for new trial is put squarely in issue. That evidence consisted of the deposition testimony of Dr. Richard Gilman of Occidental College, to whom Larsen had gone in November 1967 seeking financial help in anticipated litiga-

tion, presumably with Munsingwear. It was Gilman who advised Larsen to consult with Graham Sterling. Gilman's testimony as to Larsen's conversations at that time were not protected by the attorney-client privilege that had precluded discovery of, or testimony by, Sterling himself.

On this record, we cannot accept Munsingwear's position that the post-trial evidence offered as to Gilman's recollection was material so as to permit summary judgment in its favor. Gilman's testimony indicates that the only topics considered at this time were Garter-Bare's contract and patent rights. Indeed, Munsingwear has conceded that Sterling gave no advice or counsel as to *fraud*. Gilman states only that Larsen came to him seeking financial assistance for litigation and "patent rights and a patent situation was the central issue". Gilman recommended that Larsen see Sterling because of the latter's association with Occidental College and his experience in "corporate law and contracts". Larsen stated at that time that he believed Munsingwear was about to manufacture or had manufactured a fabric that "utilized his patent rights and processes" and he believed he was entitled to damages or royalties "but he needed clarification of some particulars relating to that contract." Gilman understood that Sterling's function would be to examine the contract. After the meeting with Sterling, Larsen reported to Gilman. Gilman testified he understood from his conversation that Larsen believed he had "sound and solid patent protection and a firm and enforceable contract." Gilman's testimony in his deposition was that Larsen's interest was in obtaining "royalties or indemnity" against Munsingwear; he spoke of Larsen's claim regarding his "patent rights and royalties". The litigation that was contemplated, as Gilman reported it, was "for patent infringement."

It is Munsingwear's position that a reasonably prudent person would, of necessity, be put on notice of the need for inquiry into its *fraudulent* activity, by the very nature of the notice that Garter-Bare had as to Munsingwear's breach of contract and patent infringement. Indeed, Munsingwear attempts to support the summary judgment in its favor, on the ground that no other conclusion is possible using the reasonably prudent person test of C.C.P. § 338(4). We have grave difficulty with this assumption that notice of contract breach or notice of patent infringement constitutes, at law, notice of any fraud perpetrated by the defendant. No authority offered by Munsingwear supports its contention that notice of the violation of one's contract or patent rights triggers a duty to inquire as to possible fraud under the reasonable person notice requirements of C.C.P. § 338(4). We note, in passing, that if Munsingwear's contention were accepted, the notice provisions of C.C.P. § 338(4) would supersede, and all but destroy, the absolute four-year limitation period for actions based on written contract (C.C.P. § 337) whenever it might appear that *any* fraudulent motive or interest underlay the breach.

We are left with the same test as we announced in *Garter-Bare I,* 650 F.2d at 979, that disputed factual issues are within the province of the trier of fact. The jury, under instructions that neither party attacks, considered the question of the statute of limitations for fraud, and the evidence of Larsen's contacts with attorneys, and his knowledge of the Women's Wear Daily advertisement. The Gilman deposition testimony is wholly consistent with the position of Garter-Bare that there was nothing sufficient to put a reasonably prudent person on notice of *fraud* in the weeks and months prior to January 20, 1969. The Gilman evidence neither permitted, nor compelled, summary judgment for the defendant.

The district court's order for new trial as to the fraud claim must, however, be affirmed. The very high damages awarded for the fraud ($15 million compensatory and $15 million punitive) have been acknowledged by all as an extremely liberal award and we have no difficulty affirming the grant of a new trial as to the damages. The closer question is whether a new trial is warranted on the issue of liability. The scale tips in favor of the district judge's

evaluation of the interrelationship of the various claims and the potential impact on the fraud verdict of the jury's assumption that the Larsen '948 patent was valid. We therefore also affirm a new trial as to liability on this claim.

*Trade Secret Claims*

In response to special interrogatories put to them on the special verdict, the jury found five areas in which Munsingwear infringed trade secrets given in confidence by Larsen. The five trade secrets found by the jury were:

1. The preferred operating conditions for the Larsen experimental machine described in the letter by Knut Larsen to Richard Thistlethwaite of December 13, 1965.

2. The information that plastiseal HC111 acquired from Carum Latex had proven to work on the Spandex and the experimental machine to produce the samples already made.

3. The fact that an industrial-type glue gun can be made to act as a plastiseal extruder in the process.

4. The source of the Fox Aro glue gun which worked.

5. The removal of residual oil on the Spandex was important to maintaining adhesion of the plastiseal.

The immediate issue is that of the propriety of the judgment n.o.v. in favor of the defendant as to these five instances of alleged trade secret infringement. The standard here, as before (see *supra* ), is that of substantial evidence to support the jury's findings.

California follows the Restatement (First) of Torts, § 757, in its definition of a trade secret. *Chicago Lock Co. v. Fanberg,* 676 F.2d 400, 404 (9th Cir.1982); *Forro Precision, Inc. v. International Business Machines,* 673 F.2d 1045, 1057 (9th Cir.1982); *Sinclair v. Aquarius Electronics, Inc.,* 42 Cal.App.3d 216, 116 Cal.Rptr. 654, 658 (1974).

Section 757 states:

One who discloses or uses another's trade secret, without a privilege to do so, is liable to the other if

(a) he discovered the secret by improper means, or

(b) his disclosure or use constitutes a breach of confidence reposed in him by the other in disclosing the secret to him, or . . . .

The instructions that were given without objection, and are not attacked on appeal, reiterate the definition of Section 757 and of a Comment following it, including specific statements as to the necessity for, and conditions of, the secrecy of the information. The jury was appropriately instructed as to the secrecy of certain information imparted to the defendant by the plaintiff prior to the issuance of the plaintiff's patents. The jury was also instructed,

The subject matter of a trade secret must be secret. Whether such a degree of secrecy existed in a particular case is a question of fact for you, the jury, to decide. It is not negated because one, by an expenditure of effort, might have collected the same information from sources available to the public. . .

The district judge, in his opinion granting judgment n.o.v. discusses the five trade secrets found by the jury to be infringed and stresses that the plaintiff had not proved the secrecy of the information comprising the five trade secrets. He states that matters of public knowledge or general knowledge in industry cannot be appropriated by one as his secret returning repeatedly, in his opinion, to plaintiff's failure to demonstrate that the information was not known generally in the industry. Thus, the judgment n.o.v. is supported by the district judge's view of the evidence in the light of the assumed burden of proof of the plaintiff to prove secrecy. With this we have difficulty given the history of the parties working in the research and development of Larsen's device, the cancellation of their Agreement by Munsingwear allegedly because it had discontinued interest in the ideas and the product for lack of commercial potential, and the almost immediate development of

the ideas and the product—resulting in the merchandizing of the girdles and the obtaining of the Cuozzi patent which Munsingwear admits was in all relevant respects the same as the Larsen '748 patent which predated it.

On this record we find substantial evidence that Larsen did possess valuable secrets which he disclosed confidentially to Munsingwear pursuant to their agreement, prior to the issuance of his patents. On this record we find substantial evidence that Munsingwear merchandised a garment that was very closely similar to the Larsen process. This being so, the burden shifted to Munsingwear to show that

> at the time, it could have arrived at the process by independent invention, inspection, or reverse engineering.

*Henry Hope X-Ray Products, Inc. v. Marron Carrel,* 674 F.2d 1336, 1341 (9th Cir. 1982), quoting from *Greenberg v. Croydon Plastics Co., Inc.,* 378 F.Supp. 806, 815 (E.D. Pa.1974).

This shift of burden is of importance in this case. The district judge, in support of his judgment n.o.v. noted that there was "undisputed evidence" that the defendant never used H–111–C plastisol and that it did not use the Fox Aro glue extruder. The evidence in the record can be read as supporting a contrary conclusion. There is substantial use of Munsingwear's interest in, study of, and work with, the trade secret information found to be such by the jurors, giving the jurors' verdicts the benefits of the presumptions to which they are entitled on a review of judgment n.o.v. "Use" during the contractual research and development period may, on this record, be deemed to have extended into Munsingwear's "use" of it in the period that followed its notice that it was abandoning the project. Once again, the interrelationship of one count with another, a factor which the district judge himself noted, makes it impossible as to these trade secret claims, to disregard the pleading and evidence from which the jurors might have found the existence of a confidential relationship, a fraudulent motive in the timing and notice of Munsingwear's "abandonment" of the project, and the continued use of Larsen's information and ideas in the so-called Cuozzi process which Munsingwear actively developed in the post-"abandonment" period.

The state of the record is such that judgment n.o.v. cannot be affirmed as to the five trade secret claims. At the same time, the alternative order for new trial cannot be overturned on this record. Given the interwoven nature of the claims and the exceptionally high damages, a new trial is appropriate as to liability and as to damages on the trade secret claims.

Appellee contends on appeal that judgment n.o.v. might be sustained on the ground that these trade secret claims are barred by the two-year statute of limitations for claims based on oral contract (C.C.P. § 339) or the three-year statute of limitations for fraud (C.C.P. § 338(4)). The district court judge did not base his judgment n.o.v. on this ground and we, likewise, refrain from doing so. Garter-Bare contends that the gravamen of the trade secret claims is fraud, and as we have noted, there are heavy fraud overtones in the pleading and in the evidence Garter-Bare sought to produce. If there are fact issues to be determined as to applicability of the statute of limitations to the trade secret claims, inquiry may be made by the trier of fact, on retrial.

*Claims for tortious interference with prospective business advantage:*

The jury awarded Garter-Bare $500,000 on its claims that Munsingwear was guilty of unfair competition under California tort law. This court has recognized the California tort as requiring the plaintiff to establish:

(1) the existence of a special economic relationship between appellants and third parties that may economically benefit appellants;

(2) knowledge by the appellees of this relationship;

(3) intentional acts by the appellees designed to disrupt the relationship;

(4) actual disruption of the relationship; and

(5) damages to the appellants.

*Rickards v. Canine Eye Registration Foundation, Inc.,* 704 F.2d 1449, 1456 (9th Cir. 1983), citing *Buckaloo v. Johnson,* 14 Cal.3d 815, 827, 537 P.2d 865, 872, 122 Cal.Rptr. 745, 752 (1975). It is also essential that "some identifiable pecuniary or economic benefit must accrue to appellees that formerly accrued to appellants." *Id.* 704 F.2d at 1456.

■ The district judge granted summary judgment holding that the invalidity of the Larsen '748 patent, "plaintiff's potential for economic benefit derived from the licensing and sale of its product is limited to competing in the marketplace with a product whose concept lies wholly within the public domain." He held that the obtaining of the Cuozzi patent and its later dedication to the public caused no tortious interference with plaintiff's prospective business. Moreover, he held that there was no showing of damage as there was no evidence to show that any manufacturer declined to contract with Garter-Bare because of the fear of a battle with Munsingwear.

Garter-Bare responds that evidence of Garter-Bare's efforts to delay the filing of the Larsen patent application on the single-layer garment, added to its announced abandonment of the research and development under its Agreement with Garter-Bare, added to its simultaneous development of the so-called Cuozzi process and the obtaining of a patent by its employee Cuozzi, followed by its very successful merchandising of the girdle styles incorporating the so-called Cuozzi process, lead to inevitable inferences of damage to Garter-Bare's ability to enter into any other profitable relationships for the commercial exploitation of the Larsen process. Garter-Bare points to the reality of "one of the giants of the garment industry" merchandising a garment under its own patent which, in essential respects is identical to the Larsen patent. (Munsingwear at oral argument admitted that the Cuozzi patent was anticipated by the Larsen patent). Was this evidence such that the jury might infer tortious interference with Larsen's ability to obtain any successful commercial advantages with others in the garment industry? Applying the traditional standard to a judgment n.o.v., as to this issue, we must come down on the side of the party against whom the judgment was rendered. The advantage flowing to one who causes tortious unfair competition may be either pecuniary or competitive. *DeVoto v. Pacific Fidelity Life Ins. Co.,* 618 F.2d 1340, 1348 (9th Cir. 1980). We cannot overlook the evidence in this record of Munsingwear's competitive advantage seen particularly in the context of the specific acts which Garter-Bare alleged, and the jury obviously believed, were fraudulent acts.

While we reverse the judgment n.o.v. as to this tort claim we are, once again, persuaded that the alternative grant of a new trial on this issue should not be disturbed. As noted earlier, the new trial as to damages seems required. A new trial as to liability presents a closer question, but the district court's concern with the possible impact of the assumed validity of the '748 patent cannot be ignored. The order for new trial is therefore affirmed.

*Summary:*

This case has consumed the energy and emotion of the parties and of the court for nearly fourteen years. The expense caused by this protracted litigation is manifest. It is a case that should be settled, and settled promptly, giving realistic and concrete attention to each party's vulnerability and each party's strength. It is not a time for either side to opt for further gambling. It is a time for a termination of the litigation through realistic compromise and settlement.

In summary, we affirm the judgment n.o.v. as to the claims based on patent. Solely on the ground of the bar of the statute of limitations, we affirm the judgment n.o.v. as to the contract claims. We reverse summary judgment as to the fraud claims, but affirm the grant of a new trial as to both liability and damages as to those claims. We reverse judgment n.o.v. as to

the claims based on tortious interference with prospective business advantage and on misappropriation of trade secrets but affirm the grant of a new trial as to both liability and damages as to those claims.[1]

Reversed in part and affirmed in part and remanded for further proceedings.

ELY, Circuit Judge, dissenting in part:

I respectfully dissent from the portion of the majority opinion that reverses the District Court's rulings on the fraud claims, trade secret claims, and claims for tortious interference with prospective business advantage.

In my judgment, the District Court was correct in all respects. The conclusion of the trial reflected an aberration of justice which the District Court quickly and decisively corrected. The record reveals that the plaintiffs fashioned this complex action, adorned with allegations of fraud, trade secret misappropriation, patent infringement and tortious interference, from a simple $3000.00 contract dispute over the interpretation of the Agreement and a claim of patent infringement. The jury, their collective vision blurred by a smokescreen of nonexistent torts and plaintiffs' pleas for sympathy, overlooked the crucial points and awarded an outrageous and unsupportable verdict in excess of $31,000,000.00, a sum equal to nearly 80% of Munsingwear's 1979 total net worth. Unlike the jury's verdict, the District Court's rulings on Munsingwear's motions for judgment notwithstanding the verdict ("judgment n.o.v."), and post-trial motion for summary judgment on plaintiffs' fraud claim, were squarely based upon the applicable law and the evidence and should be affirmed.

FRAUD CLAIM:

It is my view that the District Court correctly held that the plaintiffs' claim for fraud was barred by the applicable statute of limitations.

To determine this issue on summary judgment requires undisputed material facts which leave the inference that a "reasonably prudent person" would have had such knowledge as to put him on "inquiry" more than three years prior to the filing of the complaint. *Garter-Bare Co. v. Munsingwear, Inc.,* 650 F.2d 975, 981 (9th Cir. 1980) (*Garter-Bare I*). *See also Von Brimer v. Whirlpool Corp.,* 536 F.2d 838, 848–49 (9th Cir.1976); *Turner v. Lundquist,* 377 F.2d 44, 46–48 (9th Cir.1967). Such a finding requires the emphasis of two general legal propositions. First, we have held that section 338(4) of the California Code of Civil Procedure establishes an objective "reasonably prudent person" standard for determining when the statute of limitations begins to run. A plaintiff's personal uncertainty about, or mere failure to discover all the facts of the existence of, a fraud claim is immaterial. *See Von Brimer,* 536 F.2d at 848; *Lundquist,* 377 F.2d at 47–48. Second, once "inquiry," upon notice of sufficient facts indicating possible fraud, is triggered, "a plaintiff will be deemed to have knowledge of facts which would have been disclosed in a more extensive investigation." *Briskin v. Ernst & Ernst,* 589 F.2d 1363, 1367 (9th Cir.1978); *Von Brimer,* 536 F.2d at 848.

From a review of the record upon which the District Court granted Munsingwear's post-trial motion for summary judgment, I cannot escape the conclusion that a reasonably prudent person would have had knowledge of facts sufficient to make him suspicious of fraud, thus putting him on inquiry. This conclusion is supported by the following material facts:

One, by mid-December 1968, Larsen obtained a copy of a Munsingwear publication containing a color photograph of a woman wearing a 988 style girdle. Upon inspection, Larsen became "concerned that [he] had been deceived and mislead [sic] by

---

1. There is pending before us a motion to strike all or portions of appellants' opening brief as excessive under our rules. Much of the material contained in the appendices is merely a reproduction of material in the record but permission of the court should have been obtained. We grant the motion as to the material in the various appendices. We deny the motion as to the material contained in the brief proper, i.e. contained in the pages ending at page 72.

... Munsingwear." Unlike my Brothers, I equate deception with fraud. In fact, Black's Law Dictionary defines "deceit" as "a *fraudulent* or cheating misrepresentation ...." *Black's Law Dictionary* 493 (rev. 4th ed. 1951) (emphasis added).

Two, by mid-December 1968, Larsen concluded that Munsingwear's 988 girdle was a "violation of Garter-Bare's rights." "From [its] appearance ... [we] deducted [sic] that there must be something there, where it refers to no garters, ... our secret combination to foam ripples and exclusive stay there, and then particularly to foam ripples. We deducted [sic] that it had to do with the plastisol and the friction principle that had been disclosed to Munsingwear." Upon learning these facts, Larsen began to search for the actual girdle displayed in the photograph. Larsen also made inquiries to his lawyers, Burum and Wallen, and discussed with them the possibility of suing Munsingwear.

Three, in late November 1968, Larsen told Dr. Richard Gilman, President of Occidental College, that Munsingwear was "planning to market very shortly a product using [Larsen's] elastic fabric." Larsen also contacted Gilman in an effort to have Occidental College "participate in his [Larsen's] legal expenditures, in return for certain payments [which] would be made to the college upon success of his litigation" against Munsingwear. Although Gilman declined the offer, he put Larsen in contact with Graham Sterling, an Occidental trustee and a partner in O'Melveny & Meyers, a prestigious Los Angeles law firm. In early December 1968, Larsen consulted with Sterling, who gave Larsen "advice and recommendation for future action," including advice that Larsen "seriously consider employing a trial lawyer to contact Munsingwear."

On December 13, 1968, Larsen told Gilman that: "The whole picture was 'very clear' to him, and that it was 'most important' to move right away to pursue matters with or against Munsingwear for royalties or indemnity, as the case might be."

On December 23, 1968, Larsen's attorney Burum notified Munsingwear that his client had learned that Munsingwear was about to introduce a garterless girdle "which appear[ed] to be a direct result of the ... [A]greement."

Four, by letter dated December 22, 1967, Munsingwear notified the plaintiffs that Munsingwear "does not wish to renew the Agreement ...." Burum, by letters dated January 2 and 17, 1968, twice acknowledged that Munsingwear's letter-notice effected a cancellation of the contract. Although this event certainly did not cause the three-year fraud statute of limitations to begin, it did effectively put Burum and Garter-Bare on notice that any future employment of their designs by Munsingwear would constitute substantial grounds for suspecting fraud.

This cumulation of undisputed pre-trial, trial, and post-trial evidence leaves the inference that a "reasonably prudent person" would have been on inquiry as of December 1968 that Munsingwear was marketing a device that plaintiffs believed was the "direct result" of the Agreement. Plaintiffs admit that they "made an inquiry on December 23, 1968, to the President of Munsingwear ...." This admission, in addition to the above undisputed facts, convinced the District Court that the statute of limitations began running before the end of 1968. I am firmly convinced that this conclusion was legally correct.

The majority, in reaching its conclusion, has "grave difficulty with [the] assumption that notice of contract breach or notice of patent infringement constitutes, at law, notice of any fraud perpetrated by the defendant." The majority further asserts that "[n]o authority offered by Munsingwear supports its contention that notice of the violation of one's contract rights or patent rights triggers a duty to inquire as to possible fraud under the reasonable person notice requirements as C.C.P. § 338(4)." Such reasoning misses the mark. It is knowledge of *facts*, not precise legal theories, that triggers inquiry and the running of the statute. *See Bedolla v. Logan & Frazer,* 52 Cal.App.3d 118, 130 & n. 10, 125 Cal.Rptr. 59, 68 & n. 10 (1975). The salient point is that by mid-December 1968, a

reasonably prudent person would have been on inquiry notice of the essential *facts* comprising plaintiffs' fraud claim. These facts, in these circumstances, also constituted notice of contract breach or notice of patent infringement; however, the "dual nature" of these facts should not, and does not, invalidate the conclusion that a reasonably prudent person would have had knowledge to make him suspicious of fraud, thus putting him on inquiry.

TRADE SECRET CLAIMS:

On appeal from the judgment n.o.v., the key issue for our review is whether the plaintiffs have presented substantial evidence to support the jury's verdict. *See California Computer Products v. International Business Machines,* 613 F.2d 727, 733–34 (9th Cir.1979).

The majority correctly points out that Munsingwear contends on appeal that the judgment n.o.v. on this issue might be sustained on the ground that the trade secret claims are barred by the two-year statute of limitations for claims based on oral contract, Cal.Civ.Proc.Code § 339 (West 1982), or the three-year statute of limitations for fraud, *id.* at § 338(4). Munsingwear also made this argument to the District Court, but the District Court did not base its judgment n.o.v. on this ground. Nonetheless, plaintiffs concede that the gravamen of the trade secret claims is fraud, and as the majority notes, there are heavy fraud overtones in the pleading and in the evidence plaintiffs sought to produce. This being so, I would affirm the judgment n.o.v. on the ground that the statute of limitations for fraud bars the trade secret claims, for the reasons I have above set forth in respect to the fraud claim.

Even if one reaches the merits, plaintiffs' trade secret claims must fail because, as the District Court correctly concluded, there is no substantial evidence that the five claimed trade secrets either were legally protectable secrets or were used by Munsingwear.

First, plaintiffs failed to show that the "preferred operating conditions" of Larsen's machine were not matters of general knowledge or that it would have been difficult to acquire this information except through improper means. *See Clark v. Bunker,* 453 F.2d 1006, 1009–10 & n. 5 (9th Cir.1972). To the contrary, the evidence establishes that, for many years prior to any work by Larsen, plastisol or latex had been applied to fabrics and subsequently cured by passing them through ovens. Indeed, a patent issued in 1959 (U.S. Patent No. 2,893,315) shows an operation for applying elastomeric friction elements in the form of latex dots to glove fabric in a manner nearly identical in operation to that of Larsen's machine. Nor is there any substantial evidence that Munsingwear used the knowledge of the "preferred operating conditions" subsequent to the termination of the research and development period.

Second, as the District Court correctly observed, H–111–C was obtained from Caram Latex—"a commercial supplier of a variety of products freely available in the marketplace"—and Larsen did not select the product at all. Instead, Larsen simply described to Caram Latex a result he wished to obtain, and Caram Latex selected the specific product that it believed would accomplish the task. As the District Court correctly noted, "anyone making the same request would have been supplied the same product." The evidence also establishes that plastisols were being applied to fabrics, cured on fabrics in ovens, and used in a variety of ways, including as friction elements, long before Larsen did any work in this area, let alone shared his "knowledge" with Munsingwear. On this record, the H–111–C information simply did not rise to the level of a legally "protectable trade secret." *See id.*

Third, plaintiffs failed to produce evidence that either the fact that an industrial-type glue gun could be made to act as a plastisol extruder or that Fox Aro Company was a source of such a gun were secret, were not generally known, and would have been information difficult to obtain except by improper means. *See id.* The plastisol applying heads used with Munsingwear's machine were designed and manufactured

by Munsingwear personnel. And, as the District Court correctly observed, there was no evidence that it was not generally known in the industry that a "glue-gun" could be made to act as an extruder for materials including plastisols. On the evidence produced at trial, the District Court was correct in concluding that there was no substantial evidence to establish either that the "glue-gun" information constituted a "protectable trade secret" or that Munsingwear used a Fox Aro glue extruder subsequent to the research and development period.

Fourth, plaintiffs simply did not produce any evidence either that the cleaning of residual oil from spandex was not generally known in the industry or that Munsingwear used this information.

Finally, in reversing the District Court's judgment n.o.v., the majority states that the burden was shifted to Munsingwear to show that "at the time, it could have arrived at the process by independent invention, inspection, or reverse engineering." In so reasoning, the majority first concludes, without supporting its conclusion, that the plaintiffs have proved a crucial fact—the fact that the information at issue was indeed "secret." If I understand the law correctly, the burden is on the plaintiffs to show, without resort to presumptions of any kind, that the claimed trade secrets are "secret." *See Frodge v. United States,* 180 U.S.P.Q. 583, 587 & n. 3 (Ct.Cl.1974). The plaintiffs simply have not produced substantial evidence to support such a conclusion. The District Court was correct in granting the judgment n.o.v. as to the trade secret claims.

## CLAIMS FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE:

As with the trade secret claims, the key issue for our review is whether there is substantial evidence to support the jury's verdict. *See California Computer Products,* 613 F.2d at 733–34.

Plaintiffs allege that Munsingwear's acts lead to "inevitable inferences of damage" to plaintiffs' ability to enter into profitable relationships for the commercial exploitation of the Larsen process. In reversing the District Court's judgment n.o.v., the majority relies on evidence in the record of Munsingwear's "competitive advantage" seen "in the context" of allegedly fraudulent acts. As to the evidence of Munsingwear's competitive advantage, I have little disagreement. Munsingwear is indeed "one of the giants of the garment industry." The point at which I must part company with the majority hinges on the question it does not ask insistently enough: Did the plaintiffs present substantial evidence that they were deprived by Munsingwear of any probable beneficial economic relationship or that they sustained any proximately caused damage? This question must be answered in the negative. Viewing the evidence of Munsingwear's obvious competitive advantage "in the context" of allegedly fraudulent acts does not mask the fact that plaintiffs simply have not produced substantial evidence of the elements of their claim.

Plaintiffs have not produced a single reasonably probable "profitable relationship for the commercial exploitation of the Larsen process" that they could have entered into but for Munsingwear's acts. Plaintiffs attempted unsuccessfully to license the '748 patent to 43 companies. Yet plaintiffs produced no evidence that any of the 43 companies they contacted ever refused a license due to any act of Munsingwear. There is no evidence that Munsingwear did anything to cause such universally negative responses to plaintiffs' attempts to license the '748 patent. The obtaining of the anticipated Cuozzi patent was not enough. There is no substantial evidence that the mere issuance of the Cuozzi patent "interfered" with plaintiffs' licensing opportunities in any way. Thus, there is no substantial evidence that Munsingwear's acts proximately caused any particularized damage to plaintiffs. This being so, I would affirm the District Court's judgment n.o.v. as to this issue.

## CONCLUSION:

As the majority aptly points out, this case has consumed the energy and emotion of

the parties and of the court for nearly fourteen years. And, as the majority states, the expense caused by this protracted litigation is indeed manifest. This Court now has the opportunity to bring a just and proper end to the litigation. Yet, the majority unwisely elects instead to grant a new trial on three of plaintiffs' claims. I sincerely believe that the plaintiffs have had a full and fair opportunity to prosecute their claims and have failed in that attempt by not presenting substantial evidence to support those claims. The District Court's judgments should be affirmed in all respects.